UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 2:06-CR-05 |
| V. ) | District Judge Greer |
| ) | Magistrate Judge Inman |
| MICHAEL CHARLES GUNTER ) | |

REPORT AND RECOMMENDATION

The defendant Gunter has filed a motion to suppress evidence derived from a search of his property on January 26, 2006. (Doc. 121).

The motion has been referred to the magistrate judge pursuant to 28 U.S.C. § 636 and the standing order of this court.

The issue is one of law only; no evidence was presented beyond the affidavit which was filed in support of the application for the search warrant.

The search warrant was issued by the magistrate judge of this Court on January 20, 2006. The warrant authorized the executing officer to search Mr. Gunter's residence in Newport, Tennessee, as well as all outbuildings and vehicles on or about that property, for illegal drugs and other evidence relating to illegal drug trafficking.

The affidavit actually was filed in support of *two* search warrants, one for Mr. Gunter's property, as aforesaid, and one for the property of Bill Banks, who is a co-defendant in this case. The applicant for the search warrant, and the affiant, was James D. Williams,

a Special Agent of the Tennessee Bureau of Investigation. With respect to the defendant Gunter, agent Williams' affidavit was based on information imparted to him by a confidential informant ("CI-1"). Moreover, the CI-1's information concerning Mr. Gunter, which CI-1 relayed to Agent Williams, was based on statements made by Banks to CI-1. In other words, to put it in starkly simple terms, Banks discussed drug trafficking with the informant and, in the course of those conversations, he mentioned Mr. Gunter by name as being a dealer of illegal drugs. The informant passed on Banks' statements regarding Gunter to Agent Williams, who included those statements in his affidavit in support of his application to search the premises of Mr. Gunter.

Defendant argues that Agent Williams' affidavit, with regard to Mr. Gunter, was based on "third-hand and even fourth-hand," information which was not otherwise corroborated or verified in any fashion, and therefore cannot constitute probable cause as a matter of law. Defendant further argues that, even if there was probable cause, the affidavit failed to demonstrate any nexus between Mr. Gunter's criminal activity and the place to be searched. Lastly, defendant argues that the search cannot be saved by the "good faith" exception of *United States v. Leon*, 468 U.S. 897 (1984), because the affiant and the executing officer were the same person, *viz.*, agent Williams.

Agent Williams' affidavit is lengthy, but it can be fairly summarized as follows:

(a) CI-1 previously had sold marijuana to Harold Grooms.

(b) CI-1 represented that he had four to six pounds of cocaine which he wished to sell to Harold Grooms and Mike Gunter, and he was discussing this potential sale with Bill Banks

2

as an intermediary.

(c) On November 29, 2005, in a recorded conversation, CI-1 expressed an interest in buying a quantity of marijuana from Banks, and Banks told CI-1 that he had seven pounds of marijuana for sale.

(d) The next day, CI-1 purchased two pounds of marijuana from Banks for $800.00 and a promise to pay an additional $1,000.00.[1]

(e) The following day, December 1, 2005, CI-1 paid Banks the remaining $1,000.00; Banks advised that he had sold the other five pounds of marijuana to another buyer, but he was expecting fifteen more pounds in a few days.

(f) On December 6, 2005, Banks and CI-1 discussed the potential sale of the cocaine [*see*, ¶ 2, above]; Banks also delivered one pound of marijuana to CI-1 at this time.

(g) On December 7, 2005, CI-1 and Banks again met to discuss the potential sale of cocaine; CI-1 also paid Banks $900.00 for the pound of marijuana purchased from Banks the day before.

(h) Banks told CI-1 that Harold Grooms and David Lancaster, an associate of Grooms, wanted Banks to deliver the cocaine to one of several possible locations.

(i) Banks told CI-1 that Grooms and Gunter were "associates in the cocaine business."

(j) On December 13, 2005, Banks told CI-1 that Gunter had gone to Florida and procured one kilogram of cocaine, that Gunter also wanted to guy one kilogram of cocaine

---

[1] The affidavit recites that all meetings between the confidential informant and Banks were recorded. *See* ¶ 10.

3

Case 2:06-cr-00005-JRG Document 139 Filed 07/07/06 Page 3 of 14 PageID #: 33

from Banks, and that he would buy even more if he was able to sell the kilogram he bought in Florida.

(k) Banks consistently told CI-1, as late as January 13, 2006 (one week before the warrant was issued), that Gunter wanted to buy two to four kilograms of cocaine; Banks said that he would get the purchase money from Gunter and would provide samples of the cocaine to Harold Grooms for testing.

(l) If the cocaine met Grooms' test for purity, Grooms would give Banks the money to buy the cocaine from CI-1; *Banks intended to buy cocaine for both Grooms and Gunter at the same time*.

(m) On December 18, 2005, Banks told CI-1 that Grooms and Lancaster had purchased four kilograms of cocaine from another supplier, but Grooms still might be interested in buying cocaine from Banks **if** Banks would provide a sample to be tested for purity.

(n) Lancaster picked up the sample of cocaine on December 23, 2005, but he failed to contact Banks; Banks had some concern that Lancaster had not given the sample to Grooms for testing. Banks indicated that Grooms was interested in buying three to four kilograms of cocaine, and that Grooms had recently purchased eight kilograms from an unknown supplier.

(o) On January 5, 2006, Banks told CI-1 that he still had not heard from Lancaster regarding the testing of the sample earlier provided. Banks asked CI-1 to get another sample of the cocaine and that Banks would personally deliver it to Grooms for testing. Banks

4

mentioned that he had sold three kilograms of cocaine to Gunter.

(p) On January 16, 2006, CI-1 told Banks that CI-1's purported supplier of cocaine had to have a minimum order of eight kilograms before he would make a delivery; Banks stated that he intended to sell Gunter two kilograms of cocaine.

(q) On January 19, 2006, Banks told CI-1 that Gunter had purchased a kilogram of cocaine and that Lancaster and Grooms had purchased two kilograms. Banks told CI-1 that Grooms was concerned about CI-1's competition with Grooms' cocaine business; Banks indicated that Grooms wanted to take possession of any cocaine ultimately intended for Gunter and "re-rock" it before it was delivered to Gunter.[2] Banks told CI-1 that Grooms believed that CI-1 was selling his cocaine too cheaply to Gunter.

®) During a meeting of CI-1 and Banks, Banks received a phone call; Banks said the caller was Gunter, that Gunter wanted to buy two kilograms of cocaine for $22,000.00 per kilogram. Banks and CI-1 also discussed the advisability of talking to Harold Grooms to determine if Grooms would buy cocaine from Banks and CI-1 **if** they agreed to sell only to Grooms and Lancaster, **or if** they agreed to sell to other customers after Grooms had re-rocked the cocaine.[3]

It should be noted at this juncture what the affidavit undeniably establishes. First, it establishes the reliability of CI-1. Secondly, it provides a wealth of probable cause to believe

---

[2]"Re-rocking" means removing some of the material from a kilogram of cocaine and then re-packaging it to appear as if it still contained one kilogram. In other words, re-rocking is a device to cheat the purchaser.

[3]If antitrust laws applied to the cocaine business, Grooms and Banks would be guilty of conspiring to restrain trade and fix prices.

5

that Mr. Banks was a huge trafficker in narcotics. Indeed, the defendant Gunter attacks neither the reliability of CI-1, nor the fact that the affidavit provides probable cause to believe that Banks was a drug dealer. It is Gunter's argument that it is *Banks'* relia-bility that is at issue and that there are no facts set forth in the affidavit that corroborate Banks' references to Gunter as a narcotics trafficker.

Probable cause may be based on hearsay if the source of the hearsay evidence is reliable. *United States v. Ventresca*, 380 U.S. 102, 103 (1965). There have been no cases cited to this Court that suggest that multiple layers of hearsay are, *as a matter of law*, insufficient to establish probable cause. If reliability is established at each successive layer, there would seem to be no reason that hearsay cannot provide probable cause to support the issuance of a search warrant. Under *Illinois v. Gates*, 462 U.S. 213 (1983), a judge is to use the "totality-of-the-circumstances" analysis in determining whether or not the affidavit establishes probable cause:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed. We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interest that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli*.

462 U.S. at 238.

As already noted, CI-1's reliability was clearly established, and Gunter does not argue otherwise. Since CI-1 was reliable, it follows that his statements to Agent Williams regarding what Banks' said to CI-1 about Gunter were both credible and reliable.[4] And thus the question: Was it reasonable for Agent Williams, and ultimately this magistrate judge, to rely upon Banks' statements regarding Gunter's involvement in the drug trade? To put it in Fourth Amendment terminology, *under all the circumstances presented by the affidavit,* did Banks' statements regarding Gunter's involvement in the narcotics trade constitute probable cause to believe that Gunter in fact was so involved? This magistrate judge so believed when he signed the warrant, and he remains of the same opinion.

"Hearsay" *per se* is not really the issue in this case. As noted, hearsay itself is no impediment to a finding of probable cause. The true inquiry is the *reliability* of the hearsay evidence. In the case of hearsay information being passed by a reliable confidential informant, from a legal standpoint the informant may be ignored. It is just as if the affiant - here, Agent Williams - personally overheard the conversation with Mr. Banks and personally heard Banks' statements regarding Gunter.[5] Keeping firmly in mind the circumstances of all the conversations between Banks and the CI-1, would Banks' statements regarding Gunter give Agent Williams reasonable cause to believe that, more likely than not, Gunter was a co-conspirator and a drug trafficker? Whether it was reasonable to so believe brings into play the reliability of *Banks'* remarks. In the context of a trial, in which Banks is a co-defendant

---

[4] And, it should be recalled that Banks' conversations with the confidential informant were recorded.

[5] Which he did, in reality; Banks' statements were recorded.

7

and testifying against Gunter, his motivations in implicating Gunter could be questioned since he arguably would have something to gain by his testimony. But in the context of a drug deal, in which Banks had absolutely nothing to gain by implicating Gunter, it is a totally different situation. A reasonable person, i.e. the archetypal man on the street, would realize that Banks had nothing to gain. Why would Banks, in such a casual, non-threatening situation, gratuitously and falsely implicate Gunter?

> [P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual context - not readily or even usefully reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many types of persons. As we said in *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. (1921), 1924, 32 L.Ed.2d 612 (1972), "Informants' tips, like all other clues and evidence coming to a policeman on the scene may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity. "One simple rule will not cover every situation."

462 U.S. at 232.

By definition, probable cause involves *probabilities*, not certainties:

> It is almost a tautology to say that determining whether probable cause existed involves a matter of probabilities, but it nevertheless fairly describes the analysis we undertake . . .. The probable cause issue must be analyzed under the totality of the circumstances as to whether there is a fair probability that a crime occurred . . ..  Although the fair probability must be certainly more than a bare suspicion . . . our court has rejected the notion that the government must show that a reasonable person would have thought, by a preponderance of the evidence, that a defendant committed a crime . . ..  In short, the requisite fair probability is something more than a bare suspicion, but need not reach the fifty percent mark.

*United States v. Garcia*, 179 F.3d. 265, 268 (5th Cir. 1999).

. . . [T]o the skeptic, any proposition - no matter how seemingly

8

> certain - carries with it a degree of doubt. But judges are not philosophers. To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, *we need only consider whether there are facts that, given the factual and practical considerations of every day life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur*.

*United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998). [Italics supplied].

> In determining whether probable cause exists, we deal with probabilities . . . which are the factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act.

*Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998).

Could Banks have been lying about Gunter's involvement? Of course he could have. But even a confidential informant with a track record of reliability can depart from the straight and narrow and tell a lie. Again, the issue is whether Banks was *probably* telling the truth, not whether he was *possibly* lying. Under all the circumstances, most of which involve Banks' efforts to put together a drug deal, it is far more likely that he was telling the truth than not. In practical effect, Banks was the informant; CI-1 was merely the conduit of the information generated by Banks.[6] The fact that the informant (Banks) admitted to a crime is an "indicia of reliability" of the information he provided. *See, e.g., United States v. Harris*, 403 U.S. 573, 583 (1971).

At the risk of belaboring the point, CI-1's reliability was firmly established and Banks' statements regarding Gunter were reliable simply because Banks had no reason under the

---

[6] Not to mention the tape recorder he was wearing.

circumstances to falsely implicate Gunter in the drug trade. *Reliability* of hearsay evidence is the key to determining whether or not that evidence provides probable cause to believe that evidence of a crime could be found at a particular place, regardless of the number of layers of that hearsay. Admittedly, the more layers there are, the more unreliable the hearsay evidence might become. But in this case, in reality there are but two layers. Gunter to Banks, and then Banks to the confidential informant.[7]

Taking into account the detailed information set forth in the affidavit, including Banks' repeated references to Gunter as a drug dealer, this magistrate judge believed, and still believes, that the affidavit supplied probable cause to believe that Gunter was a drug trafficker.

With regard to Gunter's argument that the affidavit fails to demonstrate a nexus to Gunter's criminal activity and the place to be searched - his home - , it is reasonable to expect that evidence of that drug dealing would be found in or about Gunter's residence: "In the case of drug dealers, evidence is likely to be found where the dealers live." *U.S. v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991). Therefore, having probable cause to believe that Gunter was a drug trafficker, it also was reasonable to believe that evidence of his drug dealing would be found at his residence.

If the district judge disagrees that Williams' affidavit supplied probable cause to issue

---

[7]There would be an additional layer, of course, if one should consider transmission of the information from the confidential informant to Agent Williams. But all of the conversa-tions concerning Mr. Banks and CI-1 were recorded.

10

the warrant, then the good-faith exception of *Leon* must be considered.

It is now Hornbook law, but it bears repeating: the Exclusionary Rule is not a personal constitutional right of the person aggrieved, but a judicially created remedy designed primarily to deter improper conduct by the police. *United States v. Leon*, 468 U.S. 897 (1984). Since the Exclusionary Rule was created to deter police misconduct, even evidence obtained by use of a search warrant not supported by probable cause nevertheless may be admitted into the trial if the executing officer's reliance on the search warrant was in good faith and objectively reasonable. *Leon, supra*.

In the Sixth Circuit there are four situations in which an officer's reliance on a search warrant is not reasonable, and to which the *Leon* "good faith exception" cannot apply: (1) the affidavit contains information the affiant knew or should have known is false; (2) the issuing judge lacked neutrality and detachment; (3) the affidavit is devoid of information that supports a probable cause determination, thereby rendering unreasonable any belief that probable cause exists; and (4) the warrant is facially deficient. *United States v. Czuprynski*, 46 F.3d. 560, 563 (6th Cir. 1995). Defendant does not argue that Agent Williams' affidavit contains information Williams knew to be false, or that this magistrate judge lacked neutrality and detachment, or that the warrant is facially deficient. Rather, defendant argues that the affidavit is utterly devoid of information that supports a probable cause determination. In this regard, it is a consistent theme throughout defendant's supporting brief that Agent Williams' affidavit was a "bare bones affidavit." Respectfully, the magistrate judge disagrees. If a judge, or even any lay person, read and considered only those sentences

11

in the affidavit in which Gunter was specifically mentioned, then indeed it would be "bare bones" and practically nonsensical. But the affidavit must be read and considered in its entirety. Probable cause can be compared to a mosaic. Each individual tile, viewed singly and in isolation, reveals no picture. Viewing a number of tiles still means nothing. But when one stands back and views the entire mosaic, not just the individual tiles but all of them together, then a picture can be seen. To consider only those relatively few sentences which mention Gunter only, ignoring all the other facts in the affidavit, flies squarely in the face of the "totality-of-the-evidence" analysis regimen. Defendant's reliance on *United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996), is misplaced. In *Weaver*, the informant told the affiant that, some days earlier, the informant had been on the defendant's premises and, while there, he observed a quantity of marijuana "expressly for the purpose of unlawful distribution." 99 F.3d at 1378. The Sixth Circuit first held that this was merely a statement of the informant's conclusory opinion, i.e., there was some "quantity" of marijuana on the premises that was destined for "unlawful distribution." The court went on to hold that this was a "bare bones" affidavit. The affidavit in *Weaver*, and the affidavit presented to this Court, are starkly different. Banks did not relate his opinions or subjective beliefs regarding Gunter, he related *facts*.

Under all the circumstances, Banks' statements to the confidential informant regarding Gunter's involvement in the drug trade were reliable. Once again, what possibly could have been Banks' motive to lie regarding Gunter's involvement? This fact, coupled with the fact that Banks' statements regarding Gunter were recorded, and that he thoroughly implicated

12

himself in criminal activity, provided a high-level of reliability as far as Banks' statements were concerned. Can it be said that Williams' affidavit was so lacking in any indicia of probable cause with respect to Gunter that Williams could not reasonably and in good faith rely upon the warrant that was issued by this Court? Respectfully, the court believes that he could have. Even if multiple layers of hearsay can *never* by themselves support a finding of probable cause as a matter of law, is that same knowledge chargeable to Agent Williams? Inasmuch as there seems to be no cases that flatly hold that multiple layers of hearsay as a matter of law cannot constitute probable cause irrespective of reliability, then it would seem to follow that Agent Williams could rely upon the issuance of the warrant.

In conclusion, it is still believed that the warrant, under the totality of the circumstances, established probable cause to believe that Mike Gunter was involved in narcotics trafficking, and that there was probable cause to believe that evidence of that drug trafficking would be found at his residence. Further, even if the affidavit failed to establish probable cause, it is believed that Agent Williams reasonably and in good faith relied upon the warrant when he executed it.

For the foregoing reasons, it is respectfully recommended that defendant's motion to suppress be denied.

If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the

objections are filed.

    Respectfully submitted,

                                        s/ Dennis H. Inman
                                  United States Magistrate Judge